# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

FILED
Jun 17 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

VINCENT SCOTT THAYER,

DEFENDANT(S).

# INDICTMENT

18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. § 1347 – Health Care Fraud;
18 U.S.C. § 1028A – Aggravated Identity Theft; and
18 U.S.C. §§ 981(a)(1)(C), 982(a)(7) and
28 U.S.C. § 2461(c) – Forfeiture Allegation

A true bill.

/s/ Foreperson of the Grand Jury
Foreman

Filed in open court this 17th day of

June 2025.

Rose Maher
Clerk

Bail, $ Warrant, Summons

Hon. Thomas S. Hixson, U.S. Magistrate Judge

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

LORINDA I. LARYEA
Acting Chief
Fraud Section, Criminal Division

Attorneys for United States of America

FILED

Jun 17 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VINCENT SCOTT THAYER,<br><br>Defendant. | CASE NO. 3:25-cr-00167 SI<br><br><u>VIOLATIONS</u>:<br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 2 – Aiding and Abetting;<br>18 U.S.C. § 1347 – Health Care Fraud;<br>18 U.S.C. § 1028A – Aggravated Identity Theft;<br>18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c) – Forfeiture Allegation |

# I N D I C T M E N T

The Grand Jury charges:

## Introductory Allegations

At times material to this Indictment:

1. Beginning no later than in or about June 2020, and continuing through at least in or about March 2025, the defendant, VINCENT SCOTT THAYER, devised a scheme to defraud health insurers and government programs nationwide. Companies THAYER controlled or associated with submitted claims for purportedly performing COVID-19 tests and tests for other respiratory pathogens during the public health emergency and afterward. A different company THAYER controlled submitted claims for

Evaluation and Management services ("E/M Services," also known as "office visits") related to the COVID-19 and other tests. Those E/M services were never performed, either in person or over telehealth. The government programs that received the E/M Services claims would not have paid them had they known that patients never received the services from any doctor or other qualified health professional.

2. In addition, as part of the scheme, THAYER, without lawful authorization, misappropriated the identity of a medical professional to enroll the company that billed the E/M Services in Medicare and Medi-Cal, California's Medicaid program. Medicare and Medi-Cal would not have enrolled the company, or paid subsequent claims, if they had known that there were false representations regarding the identity of the persons with ownership and control of the company.

3. In total, THAYER caused the submission of at least $68 million in false and fraudulent claims to government programs for hundreds of thousands of office visits that never took place, and received over $11.7 million.

Relevant Persons, Entities, and Accounts

4. THAYER was a resident of Santa Clara County, in the Northern District of California, and Texas.

5. Patient Payment Agent ("PPA"), doing business as My Community Testing ("MCT"), was a purported COVID-19 testing company established in Wyoming on or about June 16, 2020. PPA's principal address was located at 750 Story Road, San Jose, Santa Clara County, in the Northern District of California. PPA was an enrolled provider with Medicare, Medi-Cal, and other state Medicaid programs.

6. THAYER was the owner of PPA, and its Chief Executive Officer, President, Director, and Treasurer.

7. Individual 1 was a pathologist located in the Northern District of California.

8. Individual 2 was a nurse practitioner located in the Northern District of California.

9. Until in or about June 2022, PPA maintained a primary bank account at U.S. Bank with an account number ending in 9033. After June 2022, PPA maintained bank accounts including, but not limited to, at First Republic Bank, with an account number ending in 9343, and at City National Bank, with an account number ending in 5855.

10. THAYER was the user of email account vince@XXXXXXX.XXX, which was hosted by

Google, and which THAYER used to communicate with government programs regarding office visit claims.

11. Google's servers through which emails transited were located outside of the state of California from July to December 2021.

The Medicare Program

12. The Medicare program ("Medicare") was a federally funded health insurance program, affecting commerce, that provided benefits to individuals who were 65 years and older, and to certain disabled persons. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) in that it was a public plan or contract affecting commerce.

13. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

14. Physicians, clinical laboratories, and other health care providers that provided medical services to beneficiaries that were to be reimbursed by Medicare were referred to as Medicare "providers." Health care providers also were identified by their National Provider Identifier ("NPI") number, a 10-digit number unique to each provider (including each individual physician) which identified them for purposes of health care transactions.

15. To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. Providers further agreed not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity. If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

16. Medicare paid for claims only if the items or services were medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented by the provider.

The Medicaid Program and Medi-Cal

17. Medicaid was a jointly federal and state-funded program to provide health care benefits. Each state, the District of Columbia, and U.S. territory had its own Medicaid program, administered at the state level.

18. Medi-Cal, California's Medicaid program, was a health insurance program funded by the federal government and the State of California that provided health care benefits to low-income individuals, including families with children. Medi-Cal was a "health care benefit program" as defined in 18 U.S.C. § 24(b). Individuals who qualified for Medi-Cal benefits were referred to as Medi-Cal "beneficiaries."

19. Medi-Cal reimbursed health care providers for medically necessary treatment and services rendered to Medi-Cal beneficiaries. To obtain payment for services, an enrolled provider, using its unique provider number, submitted claims to Medi-Cal certifying that the information on the claim form was truthful and accurate and that the services provided were reasonable and necessary to the health of the Medi-Cal beneficiary.

20. During the COVID-19 public health emergency, Medi-Cal covered all outpatient services necessary for the testing and treatment of COVID-19 as certified by the attending physician or other appropriate provider. Medi-Cal paid only for diagnostic testing, testing related services, and treatment services, such as office visits and laboratory services, that were medically necessary for the diagnoses and treatment of Medi-Cal beneficiaries; were in fact provided to Medi-Cal beneficiaries; and were based on representations from providers that were true, correct, and complete.

The HRSA COVID-19 Uninsured Program

21. The Families First Coronavirus Response Act ("FFCRA") was a federal law enacted on or about March 14, 2020, as part of the federal government's initial response to the then-emerging COVID-19 pandemic.

22. The FFCRA, among other things, appropriated funds to reimburse the cost of providing diagnostic testing and services for COVID-19 in individuals without health insurance. These funds, and additional funds appropriated through subsequent legislation for testing, treatment, and vaccines for uninsured individuals, were distributed through the COVID-19 Claims Reimbursement to Health Care

Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program ("HRSA COVID-19 Uninsured Program").

23. The HRSA COVID-19 Uninsured Program was administered by HHS through its agency, the Health Resources and Services Administration ("HRSA"). HRSA contracted with UnitedHealth Group, a private insurance company, to handle claims administration and payments, which UnitedHealth Group performed through its unit Optum Health. Reimbursements by HRSA were provided on a rolling basis directly to eligible providers.

24. The HRSA COVID-19 Uninsured Program was a "health care benefit program" as defined in 18 U.S.C. § 24(b).

25. To receive reimbursement under the HRSA COVID-19 Uninsured Program, a provider was required to attest to compliance with the terms and conditions of the program. The terms and conditions required the provider to submit truthful claims, in respect to uninsured individuals, for: (a) COVID-19 testing, which was defined as a test for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19, and/or testing-related items and services such as an office visit or a telehealth visit that resulted in the administration of a COVID-19 test; (b) care or treatment related to positive diagnoses of COVID-19, where COVID-19 was the primary reason for treatment; or (c) administering a COVID-19 vaccination.

26. Providers seeking reimbursement under the HRSA COVID-19 Uninsured Program were required to enroll as a provider participant, check to ensure that patients were uninsured, submit claims and patient information electronically, and receive payment through direct deposit. As part of the enrollment process, providers certified to HRSA that they understood that a person who knowingly and with intent to defraud submitted materially false information, or concealed for the purpose of misleading, committed a fraudulent insurance act.

27. Providers then certified to HRSA that the items or services billed were medically necessary and in fact provided as stated on the claim form. Reimbursements were generally made at Medicare rates.

28. Claims submitted electronically to the HRSA COVID-19 Uninsured Program were submitted to HRSA at a server located in Minnesota. HRSA paid for claims through Optum Bank, which used servers located in Utah to electronically transfer payments to providers.

29. The HRSA COVID-19 Uninsured Program stopped accepting claims for COVID-19 testing and testing-related services after March 22, 2022.

Evaluation and Management Services

30. Claims for reimbursement of medical items and services were submitted to health care payors, including Medicare, Medi-Cal, and the HRSA COVID-19 Uninsured Program, and other insurers, using Current Procedural Terminology ("CPT") codes, a set of standardized codes used to describe the items and services provided. CMS and other payors reimbursed providers specific amounts of money, which were determined based on, among other factors, the work involved in the procedure and the complexity of the procedure. Service providers used specific CPT codes to describe the services that they claimed were provided, and health care benefit programs relied on the submitted CPT codes to decide whether to issue or deny reimbursement.

31. Providers billed for E/M Services using CPT codes 99202 through 99205 for new patients, and 99211 through 99215 for existing patients. E/M Services codes were organized into various categories and levels. In general, the more complex the visit, the higher the level of code a provider could bill within the appropriate category. To bill any code, the services furnished must have met the definition of the code, been medically necessary, and actually been provided as represented.

32. CPT codes 99202 through 99205 and 99212 through 99215 represented E/M Services that involved medical decision making. To bill for these codes, the services had to have been provided by a qualified health professional ("QHP"), that is, a physician, a nurse practitioner ("NP"), or a physician's assistant ("PA"), who was the "rendering provider" for the service and who met with and evaluated patients. Where the rendering provider of an E/M Service required a consultation with another QHP, the consultative service and report provided by the separate QHP would be billed using CPT code 99451. The identity of the rendering provider was part of each claim submitted for payment.

COUNTS ONE AND TWO: (18 U.S.C. §§ 1343, 2 – Wire Fraud, Aiding and Abetting)

33. Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated as if fully set forth here.

THE SCHEME TO DEFRAUD

34. Beginning no later than in or about June 2020, and continuing through at least in or about

March 2025, in the Northern District of California and elsewhere, the defendant,

VINCENT SCOTT THAYER,

together with others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly, willfully, and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud government health care programs, including the HRSA COVID-19 Uninsured Program, Medicare, and Medicaid (including Medi-Cal), as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts with a duty to disclose.

35. The scheme operated, in substance, as follows:

a. THAYER approached QHPs such as Individual 1 and Individual 2 about providing services for PPA or MCT related to approving requisitions for COVID-19 tests.

b. THAYER caused PPA to enroll in Medicare in or about August and September 2020 under Individual 1's name, date of birth, social security number, and NPI, and Individual 1's electronic signature, without Individual 1's authorization. This enrollment application also represented falsely that Individual 1 owned PPA, instead of THAYER, and concealed and disguised THAYER's ownership and managing control of PPA.

c. THAYER caused PPA to attempt to enroll in Medi-Cal in or about October 2020, and again in or about July 2022, under Individual 1's name, date of birth, social security number, and NPI, and Individual 1's electronic signature, without Individual 1's authorization. As with Medicare, the enrollments represented falsely that Individual 1 owned PPA, instead of THAYER, and concealed and disguised THAYER's ownership and managing control of PPA. This second enrollment was accepted by Medi-Cal in or about November 2022. THAYER also caused PPA to enroll in other states' Medicaid programs.

d. Individual 1 was not an owner of PPA and did not authorize the use of his name, date of birth, social security number, NPI, or electronic signature to enroll PPA as a provider in Medicare or Medi-Cal.

e. Between in or about August 2020 and in or about November 2020, THAYER caused PPA to enroll with HRSA as a provider in the HRSA COVID-19 Uninsured Program.

f. To obtain the beneficiary information needed to submit claims for office visits, THAYER caused PPA to set up certain COVID-19 testing sites and conduct COVID-19 testing of individuals in various locations, or associate with other parties to conduct COVID-19 testing.

g. At various times during the scheme, THAYER caused PPA to obtain beneficiary information from testing conducted at, among others, pop-up testing sites, PPA's location in San Jose, homeless encampments, and group living residences, and through arrangements with other testing companies and laboratories. In some instances, at these testing sites beneficiaries were induced to provide samples for testing, and to provide insurance and other information, through cash payments and the provision of gift cards.

h. THAYER submitted and caused PPA to submit claims to HRSA, Medicare, and Medicaid (including Medi-Cal) for E/M Services purportedly provided by Individual 1 and Individual 2, under CPT Codes 99202, 99203, 99212, 99213, 99214, 99215, and 99451, when in truth and in fact no such E/M Services had been performed by Individual 1 and Individual 2. THAYER knew the claims were for services that had not been provided as represented.

i. THAYER submitted and caused PPA to submit claims to Medicare and Medicaid for E/M Services for beneficiaries who were deceased as of the purported dates of service.

j. As a direct result of THAYER's intent to deceive and cheat, HRSA, through its contractor Optum Health, approved claims for payment and paid PPA for each of those claims based on HRSA's reimbursement rates, when otherwise it would not have done so.

k. On several occasions, to further the fraud and conceal the scheme, THAYER provided false information to HRSA, including during an official inquiry in 2021 into PPA's office visit claims. For example, on or about July 26, 2021, THAYER emailed HRSA falsified medical records bearing the electronic signature of Individual 2, to suggest Individual 2 had conducted an office visit when none had taken place. On or about September 23, 2021, THAYER emailed HRSA a false explanation of how Individual 1 or another QHP conducted office visits or consultations with patients billed under CPT codes 99203 and 99451. On or about November 8, 2021, THAYER made further false statements to HRSA by email that Individual 2 had personally provided all E/M Services billed under his/her NPI, by telehealth, on a different day than the COVID-19 testing.

l. Between in or about January 2021 and in or about September 2021, THAYER submitted and caused to be submitted to HRSA, through interstate wire communications, false and fraudulent claims in the amount of at least approximately $29,605,930 for E/M Services that were not rendered, not provided as represented, and medically unnecessary. As a result, THAYER caused HRSA to pay PPA approximately $8,948,930.

m. Between in or about May 2021 and in or about March 2025, THAYER submitted or caused to be submitted to Medicare false and fraudulent claims in the approximate amount of $15,270,956 for office visits that were not performed, medically unnecessary, and ineligible for reimbursement. As a result of these false and fraudulent claims, Medicare made payments to PPA in the approximate amount of $1,889,622.

n. Between in or about January 2021 and in or about March 2025, THAYER submitted or caused to be submitted to state Medicaid programs, including Medi-Cal, false and fraudulent claims in the approximate amount of $23,328,347 for office visits that were not performed, medically unnecessary, and ineligible for reimbursement. As a result of these false and fraudulent claims, state Medicaid programs, including Medi-Cal, made payments to PPA in the approximate amount of $913,266.

o. THAYER caused reimbursements from the HRSA COVID-19 Uninsured Program, Medicare, and Medicaid (including Medi-Cal) on the fraudulent claims to be deposited into at least the U.S. Bank 9903 account, First Republic Bank 9343 account, and City National Bank 5855 account.

36. In total, THAYER and others submitted and caused the submission of, false and fraudulent claims to Medicare, Medicaid (including Medi-Cal), and HRSA in the amount of at least approximately $68,205,233, resulting in payments to PPA in the approximate amount of $11,751,819.

## EXECUTION OF THE SCHEME AND USE OF THE WIRES

37. On or about the following dates, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendant,

VINCENT SCOTT THAYER,

and others known and unknown to the Grand Jury, each aiding and abetting one another, for the purpose of executing the above-described scheme to defraud, knowingly transmitted and caused the transmission

of the following items by means of wire communications in interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| ONE | 7/26/2021 | 5:42 p.m. email from vince@XXXXXXX.XXX to HRSA attaching falsified medical records for beneficiaries who had purportedly received E/M Services |
| TWO | 11/8/2021 | 7:49 p.m. email from vince@XXXXXXX.XXX to HRSA attaching a false explanation that Individual 2 had conducted the E/M Services by telehealth |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS THREE TO SIX: (18 U.S.C. §§ 1347, 2 – Health Care Fraud, Aiding and Abetting)

38. Paragraphs 1 through 36 of this Indictment are re-alleged and incorporated as if fully set forth here.

THE SCHEME TO DEFRAUD

39. Beginning no later than in or about June 2020, and continuing through at least in or about March 2025, in the Northern District of California and elsewhere, the defendant,

VINCENT SCOTT THAYER,

together with others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly, willfully, and with the intent to defraud, executed a scheme and artifice: (1) to defraud health care benefit programs, namely, Medicare, Medicaid (including Medi-Cal), and the HRSA COVID-19 Uninsured Program; and (2) to obtain money from health care benefit programs, namely, Medicare, Medicaid (including Medi-Cal), and the HRSA COVID-19 Uninsured Program, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, both in connection with the delivery of and payment for health care benefits, items, and services.

40. The fraudulent scheme operated, in substance, as described in paragraphs 35 and 36 of this Indictment.

EXECUTION OF THE SCHEME

41. On or about the following dates, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendant,

VINCENT SCOTT THAYER,

together with others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and willfully executed and willfully caused the execution of the fraudulent scheme described above by submitting and causing to be submitted to Medicare and Medicaid (including Medi-Cal) the false and fraudulent claims identified below:

| COUNT | CLAIM NO. | APPROX. DATE CLAIM SUBMITTED | INSURER | SERVICES BILLED | APPROX. AMOUNT BILLED | APPROX. AMOUNT PAID | BENE-FICIARY |
|---|---|---|---|---|---|---|---|
| THREE | 5409233 4533350 0 | 12/11/2023 | Medicare | CPT 99213 | $275 | $82.60 | J.G.-T. |
| FOUR | 5409240 7512834 0 | 3/15/2024 | Medicare | CPT 99212 | $156.88 | $52.74 | K.T. |
| FIVE | 5409232 4022042 0 | 8/28/2023 | Medicare | CPT 99203 | $393.00 | $0 | B.H. |
| SIX | 2307806 4025753 9 | 7/3/2023 | Medi-Cal | CPT 99213 | $275.00 | $23.76 | K.A. |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

COUNT SEVEN: (18 U.S.C. §§ 1028A, 2 – Aggravated Identity Theft, Aiding and Abetting)

42. Paragraphs 1 through 36 and 39 through 40 of this Indictment are re-alleged and incorporated as if fully set forth here.

43. Beginning at least in or about August 2020, and continuing through at least in or about September 2020, in the Northern District of California and elsewhere, the defendant

VINCENT SCOTT THAYER,

together with others known and unknown to the Grand Jury, each aiding and abetting the others, during and in relation to a felony violation of 18 U.S.C. § 1347 (Health Care Fraud) set forth above, knowingly transferred, possessed, and used, without lawful authority, means of identification of another person, that is, the name, date of birth, social security number, and National Provider Identification of Individual 1, in violation of Title 18, United States Code, Sections 1028A and 2.

<u>COUNT EIGHT</u>: (18 U.S.C. §§ 1028A, 2 – Aggravated Identity Theft, Aiding and Abetting)

44. Paragraphs 1 through 36 and 39 through 40 of this Indictment are re-alleged and incorporated as if fully set forth here.

45. Beginning at least in or about July 2022, and continuing through at least in or about November 2022, in the Northern District of California and elsewhere, the defendant

VINCENT SCOTT THAYER,

together with others known and unknown to the Grand Jury, each aiding and abetting the others, during and in relation to a felony violation of 18 U.S.C. § 1347 (Health Care Fraud) set forth above, knowingly transferred, possessed, and used, without lawful authority, means of identification of another person, that is, the name, date of birth, social security number, and National Provider Identification of Individual 1, in violation of Title 18, United States Code, Sections 1028A and 2.

<u>FORFEITURE ALLEGATION ONE</u>: (18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c))

The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

Upon conviction for any of Counts One, Two, Seven, or Eight set forth in this Indictment, the defendant,

VINCENT SCOTT THAYER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations, including but not limited to a money judgment.

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

FORFEITURE ALLEGATION TWO: (18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c))

The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461(c).

Upon conviction for any of Counts Three through Six set forth in this Indictment, the defendant,

VINCENT SCOTT THAYER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461(c), all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction under Counts Three through Six.

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982(a)(7), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED: June 17, 2025

A TRUE BILL.

/s/ *Foreperson*
FOREPERSON

CRAIG H. MISSAKIAN
United States Attorney

/S/
RYAN ARASH REZAEI
Assistant United States Attorney
U.S. Attorney's Office for the
Northern District of California

LORINDA I. LARYEA
Acting Chief, Fraud Section
U.S. Department of Justice

/S/
MATTHEW R. BELZ
LAUREN R. RANDELL
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice